UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA,

              Plaintiff,

    v.                           CIVIL ACTION NO. 2:10-1087

$88,029.08, MORE OR LESS,
IN UNITED STATES CURRENCY,

              Defendant.

(Katherine Anne Hoover, M.D. and
 John F. Tomasic;
 No pending federal criminal charges)

MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES MOTION
FOR SUMMARY JUDGMENT AS TO THE INTEREST OF JOHN F. TOMASIC

A.   Statement of the Case

    1.    The United States filed the Verified Complaint of Forfeiture seeking to forfeit the sum of $85,127.08, more or less, in United States currency seized from the WesBanco joint checking account no. XXXXXX9705, of Katherine A. Hoover, M.D., or John F. Tomasic, pursuant to a federal seizure warrant, and to forfeit the sum of $2,902, more or less in United States currency seized during the execution of a federal search warrant on the bedroom used by Katherine A. Hoover, M.D., in the home of Dr. Diane Shafer, Williamson, West Virginia. (Doc. 1, ¶ 2(A), (B)). The United States has alleged that both sums of currency constitute proceeds

derived by Dr. Hoover from the medical clinic[1] where she was employed and where she allegedly conspired with other physicians and staff to distribute controlled substances outside the usual course of professional practice and to misuse the DEA registration numbers of other physicians, in violation of 21 U.S.C. §§ 841(a)(1), 843(a)(2), 846, and <u>United States v. Singh</u>, 54 F.3d 1182, 1186 (4th Cir. 1995). The United States has also alleged that the defendant currency was used or intended to be used to facilitate one or more controlled substance violations. (Doc. 1, ¶ 8, 9).

2.    On September 28, 2010, the United States sent Notice of the forfeiture action to Mr. Tomasic (and Dr. Hoover) to multiple addresses associated with them (Doc. 5). Thereafter, starting on October 18, 2010, and continuing throughout the litigation of this case, Mr. Tomasic has filed numerous documents in this forfeiture

---

[1]During the time period that Dr. Hoover was employed at the medical clinic at issue in this case, the clinic went through several name changes, although many of the staff (including Dr. Hoover) remained. From at least January 2004 until approximately January 2006, it was known as the Williamson Wellness Center and purportedly was owned by Dr. William F. Ryckman, M.D., of Sutersville, Pennsylvania. From January 2006 through approximately January 2009, the clinic was named Mountain Medical Care Clinic, Inc., and was owned by Camille Helsel, nurse practitioner at the clinic. In approximately January 2009, ownership of the clinic was abruptly changed and the clinic was renamed "William F. Ryckman, M.D." <u>See</u>, Affidavit of FBI Special Agent James F. Lafferty II, attached to and incorporated into the United States motion for summary judgment being filed simultaneously herewith. For ease of reference throughout this memorandum of law, the medical clinic will be referred to as "the clinic" or "the Williamson clinic."

action to assert claims he has in the defendant currency. His initial filings alleged that the defendant currency ($85,127.08) was the balance of a lawsuit settlement from the death of his and Dr. Hoover's son but he did not assert any claim to the $2,902 seized from Dr. Hoover's bedroom in the Shafer house in Williamson (Doc. 15, 20, 29, 32, 46).

3.    In response to a motion filed by claimants alleging lack of subject matter jurisdiction, the United States filed redacted copies of bank statements from claimants' WesBanco account to show that the lawsuit settlement not only was deposited into the account but also was spent or otherwise transferred out of the account. (Doc. 35, 37).

4.    Thereafter, in later motions filed by claimants in this case, Tomasic (and Dr. Hoover) began alleging that Tomasic had "loaned" his wife the $151,000 that was transferred into her uncle's estate and that her subsequent salary deposits were repayments to Tomasic of that alleged loan.  (Doc. 87, 94).

5.    The United States is filing this motion for summary judgment on the grounds that, based on the bank account records and the admissions of claimants Mr. Tomasic and Dr. Hoover in pleadings they have filed in this case, there exists no genuine issue of material fact that the currency seized from WesBanco Checking Account No. XXXXXX7905 constitutes moneys traceable to Dr. Hoover's employment with the clinic and that the account, at the time of its

3

seizure, had no monies remaining in it that can be attributed to the lawsuit settlement or any other alleged legitimate source of income claimed by John F. Tomasic.   Since he had no ownership interest in any of the funds in the account on the date it was seized, Mr. Tomasic has no standing and no claim to any of the defendant currency.   Summary judgment should be entered in favor of the United States and as against Mr. Tomasic on the WesBanco Checking Account No. XXXXXX7905.

6.   Likewise, Mr. Tomasic has no interest in the defendant currency totaling $2,902 that was seized from Dr. Hoover's bedroom in Dr. Shafer's house.   In earlier filings in this case, the claimants have admitted that a portion of those funds came from one of Dr. Hoover's payroll checks from the Williamson clinic that she deposited and received $500 cash back (Doc. 20 ¶ 2(B), and that the remaining balance originated from $3,000 cash that Hoover obtained when cashing a check drawn on her uncle's estate (Doc. 15; 20, ¶ 2(B); 29; 32).   In subsequent filings in this case, claimants allege that "the remaining $2,902.00 taken from Dr. Hoover's bedroom in Williamson, WV, belonged to Mr. Tomasic as repayment on his loan ..." (Doc. 94).   Regardless of the source of the funds, the cash found in her bedroom was allegedly money that Dr. Hoover had in her possession to pay her expenses while working at, and thus enabling her to work at, the clinic in Williamson, West

Virginia.   Summary judgment should be awarded to the United States against any interest alleged by John F. Tomasic in that currency.

### B.   Statement of Facts:

1.   On February 25, 2010, and upon application and affidavit of FBI Special Agent James Lafferty, a federal seizure warrant was issued by United States Magistrate Judge Mary E. Stanley in Magistrate Case No. 2:10-mj-00029, authorizing the seizure of two banks accounts held by Dr. Katherine A. Hoover at WesBanco Bank, that is, Checking Account No. XXXXXX7905 and Savings Account No. XXXXXX3002.[2]   The seizure warrant was executed on the checking account on March 2, 2010, and $85,127.08 was seized from that account.   The WesBanco checking account was in the name of "Katherine A. Hoover, M.D., or John F. Tomasic."

2.   Also on March 2, 2010, a federal search warrant was obtained (Magistrate Case No. 2:10-mj-00035) and executed the same day on a bedroom used by Dr. Hoover at the residence of Dr. Diane Shafer while Hoover was in Williamson working at the clinic.[3]   The defendant currency totaling $2,902, more or less, was located in the bedroom and seized.

---

[2]Savings Account No. XXXXXX3002 has been dismissed from this case (Doc. 93) and is not being addressed in this memorandum of law.

[3]Hoover's primary residence at the time was in Lost Creek, Harrison County, West Virginia.

5

3.   Administrative forfeiture proceedings were initiated against the seized currency by the FBI.  Hoover filed a claim for the $85,127.08 with the FBI in its administrative forfeiture proceeding.  As a result of her filing a claim, the FBI ceased its administrative action and referred the seizure to the United States Attorney's Office for the initiation of judicial forfeiture proceedings.

4.   On September 10, 2010, this civil forfeiture action was filed (Doc. 1), on the following grounds:

(A)  With regard to the monies seized from the WesBanco checking account, the United States has alleged that proceeds generated by the clinic have been deposited into the clinic's account and thereafter have been transferred in part into Dr. Hoover's WesBanco Checking Account No. XXXXXX7905 through the form of checks drawn on the clinic's bank account and, as such, constitute proceeds traceable to one or more controlled substance violations committed at the clinic. (Doc. 1, ¶ 18).

(B)  With regard to the cash seized from Dr. Hoover's bedroom at Dr. Shafer's house, the United States has alleged that due to the substantial cash payments made by patients at the clinic and the close proximity of this locale to the clinic, the seized currency constitutes proceeds traceable to one or more controlled substance violations committed at the clinic. (Doc. 1, ¶ 19). Representations made by the parties in various documents filed in

this case indicate that these monies may, in part, be proceeds from Dr. Hoover's paycheck from the clinic. [See, Doc. 20, ¶ 2(B)]. The United States has also generally alleged that the seized currency was used or intended to be used to facilitate one or more controlled substance violations. (Doc. 1, ¶ 8). Dr. Hoover stayed at Dr. Shafer's house in Williamson while she was in town working at the clinic, and these monies allegedly were being used by Dr. Hoover to pay her living and other expenses while in Williamson, thus enabling her to work at the clinic.

5.    On September 28, 2010, the United States sent Notice of this forfeiture action to John F. Tomasic (and Dr. Hoover), as evidenced by the Certificate of Service on file with the Clerk's Office in this case (Doc. 5).

### $85,127.08 Seized from WesBanco Checking Account

6.    On November 2 and November 23, 2010, verified responses for John F. Tomasic individually, and for John F. Tomasic and Katherine Anne Hoover, were filed with the court in response to the forfeiture complaint (Doc. 15, 20).

(A) These responses allege that the $85,127.08 removed from the WesBanco checking account no. XXXXXX7905 were from the lawsuit settlement paid to John Tomasic over the death of their son. Further documents filed with the court by Tomasic and Hoover allege that the money in the checking account was the "lawsuit settlement" (Doc. 29, 32, ¶ 1, 2); (Doc. 46, p. 4).

7

(B)   Dr. Hoover admits in her November 23 verified response that "...the checks deposited [into the WesBanco checking account] from Dr. Ryckman[4] were payment for medical care of patients seen at 35 West Third Avenue, Williamson, West Virginia, in the usual course of Dr. Hoover's professional practice." (Doc. 20, ¶ 2(A)).   Dr. Hoover further admits that she "...received payment from Dr. Ryckman for providing medical care at the practice.   Checks were deposited in part and part was taken in cash." (Doc. 20, ¶ 16).   See also, claimants' motion filed on February 11, 2011 (Doc. 46, p. 3) containing a detailed explanation to support Dr. Hoover's receipt of paychecks from Dr. Ryckman.

(C)   In more recent filings, claimants now allege that Mr. Tomasic loaned Dr. Hoover the lawsuit settlement monies to help her settle her uncle's estate and other expenses, that her deposit of her paychecks from the clinic into the WesBanco account were repayment of that debt, and that the monies seized from her room at Dr. Shafer's residence "belonged to Mr. Tomasic as repayment on his loan." (See, Doc. 87, p. 2; Doc. 94).

(D)   A copy of the settlement order in Hoover v. W.Va. Regional Jail and Correctional Facility Authority, et al., Civil Action No. 1:07-cv-00047 MK (USDC NDWV) is incorporated into the United States motion for summary judgment accompanying this memorandum of law.   The settlement order reveals that Dr. Hoover

---

[4]See, Footnote 1 on page 3.

8

and Mr. Tomasic each received a settlement award of $191,775.75, however, as will be further established in this memorandum of law, only one deposit of $191,775.75 was made into the WesBanco account.

### $2,902, More or Less, in U.S. Currency Seized From Dr. Hoover's Bedroom at Dr. Shafer's House

7.   As for the $2,902, the verified responses filed by the claimants provide the following:

(A)   The November 2 response (Doc. 15) filed by Tomasic alleged that he was with Dr. Hoover when she cashed a check from her uncle's estate and that Dr. Hoover received $3,000 cash and a certified check for the remainder.

(B)   In the November 23 response, Hoover alleges that the money seized from her bedroom at Dr. Shafer's house ($2,902) was the balance still in her possession from two sources:  $3,000 cash that Dr. Hoover obtained when she cashed a check from her uncle's estate and $500 cash that she received when she cashed one of her paychecks from the clinic. (Doc. 20, ¶ 2(B)).

(C)   John F. Tomasic never alleged an interest in the $2,902 in either of these verified responses.

(D)   Further documents filed by Tomasic and Hoover allege that the money seized from Dr. Hoover's bedroom was primarily from $3,000 cash from her uncle's estate (Doc. 29, 32, ¶ 1, 2); (Doc. 46, p. 4).

(E)  In recent filings, claimants now allege that the $2,902 seized from Dr. Hoover's room "...belonged to Mr. Tomasic as repayment on his loan .." (Doc. 94).

### Financial Analysis of the WesBanco Checking Account
### Using the Lowest Intermediate Balance Rule

8.  The United States has filed as an exhibit to its motion for summary judgment the Affidavit of FBI Special Agent James Lafferty II, which provides a detailed financial analysis of the WesBanco checking account including incoming deposits and outgoing payments and includes true and accurate copies of bank records he obtained through legal process and which he has reviewed for purposes of preparing his analysis.[5] Agent Lafferty is a Certified Public Accountant and has extensive experience and training in analyzing bank records and tracing deposits and withdrawals.  The United States incorporates herein the analysis set forth by Agent Lafferty as to the deposits and withdrawals from the WesBanco checking account no. XXXXXX7905 for the period August 2008 through February 2010, and accompanying bank records.  Using the Lowest Intermediate Balance Rule, Special Agent Lafferty has determined that the balance of the WesBanco account seized on March 2, 2010, that is, $85,127.08, is traceable to proceeds derived by Dr. Hoover from the clinic through her paychecks.

---

[5]The bank records have been redacted to black out any reference to account numbers and taxpayer identification numbers.

### C. **Argument**

### (1) **The Standard for Granting Summary Judgment**

Summary judgment in civil forfeiture cases based on lack of standing is governed by Rule G(c)(i)(B) and (c)(ii)(B), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and Rule 56, Federal Rules of Civil Procedure.

Supplemental Admiralty Rule G(c) provides in pertinent part the following:

> (i) At any time before trial, the government may move to strike a claim or answer:
> . . .
> (B) because the claimant lacks standing.

> (ii) The motion:
> (A) must be decided before any motion by the claimant to dismiss the action; and
> (B) may be presented . . . by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence.

United States v. $20,193.39 U.S. Currency, 16 F.3d 344, 346 (9th Cir. 1994) (standing is a threshold issue on which the claimant in a forfeiture action bears the burden of showing he has an interest in the forfeited property). See also, United States v. $38,570, 950 F.2d 1108, 1111 (5th Cir. 1992); United States v. Mercado, 873 F.2d 641, 644 (2d Cir. 1989).

Rule 56(c), Federal Rules of Civil Procedure, provides that a Court should render summary judgment if it concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking

summary judgment bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Rule 56(c)). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-8, 106, S. Ct. 2505, 2510 (1986) (emphasis in original). See also, Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1355-56 (1986). Summary judgment is appropriate in civil forfeitures where this standard is met. See, e.g., United States v. One 1987 Mercedes Benz 300E, 820 F. Supp. 248 (E.D. Va. 1993) (granting summary judgment to government where there was no material issue of fact).

Whether there is a genuine issue of fact for trial depends on the substantive law of the underlying case and the evidentiary burdens that law places on each party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. at 252-56 (noting that "the judge must view the evidence presented through the prism of the substantive evidentiary burden"); Richards v. Neilsen Freight Lines, 810 F.2d

898, 902 (9th Cir. 1987).  Thus, in the instant case, the summary judgment rules must be "construed in the light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein."  United States v. One 56-Foot Motor Yacht Named Tahuna, 702 F.2d 1276, 1281 (9th Cir. 1983) (quoting United States v. One 1975 Mercedes 280S, 590 F.2d 196, 199 (6th Cir. 1978)).

   E.   **Claimant John F. Tomasic Lacks Article III Standing Since he has Neither an Ownership Nor a Possessory Interest in the Defendant Currency**

   In order to defend a civil forfeiture action, a claimant must establish Article III standing, that is, a claimant must establish that he is either the colorable owner of the seized property or has a colorable possessory interest in it.  United States v. $7,000.00 in U.S. Currency, 583 F. Supp.2d 725, 729 (W.D. N.C. 2008). Article III standing requires the claimant to proffer some evidence of an ownership interest.  Id.  Bare legal title to property is insufficient, standing alone, to confer standing upon a claimant. Courts generally look to dominion and control, such as possession, title and financial stake, as evidence of an ownership interest. Id.  Under the "dominion and control" test, "...even legal owners of property must 'demonstrate some dominion or control or other indicia of true ownership beyond mere legal title.'"  United States v. $447,815.00 in U.S. Currency, 2011 WL 4083640 (M.D. N.C. 2011). A claimant with legal title to a joint bank account must show that he was not a "nominal or straw owner" to establish standing.

United States v. U.S. Currency, $81,000, 189 F.3d 28, 35 (1st Cir. 1999). See also, United States v. Morgan, 224 F.3d 339, 343-44 (4th Cir. 2000) (applying the dominion and control test to joint bank account in the criminal forfeiture setting). The burden of establishing standing rests with the claimant. 583 F. Supp.2d at 730.

    **(1)   Claimant John F. Tomasic Has no Ownership or Possessory Interest in the Monies Seized from the WesBanco Account because the Alleged Legitimate Proceeds in which He is Claiming an Interest Were No Longer in the Account at the time of Seizure**

The United States is seeking forfeiture of the defendant currency seized from the WesBanco checking account, pursuant to 21 U.S.C. § 881(a)(6), on the grounds that the currency constitutes proceeds traceable to controlled substance violations. Tracing the tainted proceeds is part of the government's burden of proof. United States v. $8,221,877 in U.S. Currency, 330 F.3d 141, 158 (3rd Cir. 2003). However, the government is not required to trace the property to a particular offense; it is enough if the property is traceable to a certain pattern or set of criminal offenses that are described in the complaint generally. United States v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004) (en banc) (in a civil forfeiture case based on drug trafficking, the government does not have to show a relationship between the property and a particular drug transaction). It is sufficient that the government establishes, by a preponderance of the evidence, that the money

came from drug trafficking generally. Id. When proceeds of the crime change in form, the taint follows the property and the new property becomes the defendant in rem. United States v. 5709 Hillingdon Road, 919 F. Supp. 863, 868 (W.D. N.C. 1996), rev'd on other grounds, United States v. Leak, 123 F.3d 787 (4th Cir. 1997); and United States v. 1990 Chevrolet Silverado Pickup, 804 F. Supp. 777, 784 (W.D. N.C. 1992).

Where tainted proceeds are commingled with legitimate funds by depositing both in the same bank account, courts have upheld usage by the government of accounting principles and circumstantial evidence to show that the funds in the account are traceable to the underlying criminal activity. The leading case on point is United States v. Banco Cafetero Panama, 797 F.2d 1154, 1158-62 (2nd Cir. 1986) (government is entitled to use "first in, first out" or "first in, last out" analysis in tracing tainted funds through a volatile bank account, but government is subject to the "lowest intermediate balance" rule). Finding legislative history supportive of forfeiting "proceeds" commingled with other assets so long as a "traceable connection" to an illegal drug transaction existed, the Banco Cafetero court went on to identify three accounting approaches, including the lowest intermediate balance rule, that could be used to determine the "traceable connection." Id. The Banco Cafetero court provided the following example of the "drugs

in, last out" rule, also known as the lowest intermediate balance rule:

> If $100 from a drug sale is deposited into an active account, one approach is to consider the account to be "traceable proceeds" to the extent of $100 as long as the account balance never falls below that sum.  Under this approach, untainted money added to the account after the balance has fallen below the amount of the tainted proceeds is immune from seizure.

797 F.2d at 1159, text at fn.5.  The lowest intermediate balance rule has been recognized in the Fourth Circuit in application to forfeiture cases (In re: Moffitt v. Zwerling, 875 F. Supp. 1152, 1159-61 (E.D. Va. 1995), rev'd on other grounds, 83 F.3d 660 (4th Cir. 1996), and United States v. Moore, 27 F.3d 969, 977 (4th Cir. 1994)), and in the commercial law context (Sony Corp. Of America v. Bank One, 85 F.3d 131, 138 (4th Cir 1996)).

In his various pleadings and motions filed in this case, Mr. Tomasic initially alleged that the balance of the WesBanco Checking Account No. XXXXXX7905 that was seized on March 2, 2010, that is, $85,127.08, constituted the remainder of his lawsuit settlement resulting from the death of his son.  (Doc. 29 & 32, ¶ 1, 2; Doc. 46, p. 4).  A copy of the order representing that settlement is attached to and incorporated into the United States motion for summary judgment as "Govt's SJ Exhibit B."  Under the terms of that settlement, Mr. Tomasic received the sum of $191,775.75, and his wife Dr. Katherine Hoover was also awarded the same amount.

Records of the WesBanco Checking Account No. XXXXXX7905, for the period August 2008 through February 2010, are attached to and incorporated into the Affidavit of Special Agent James F. Lafferty II, which is "Govt's SJ Exhibit A" to the United States motion for summary judgment.  The records and the Affidavit of Agent Lafferty establish the following:

(a) On July 31, 2008, the account balance was $13,431.08;

(b) Between July 31, 2008 and July 31, 2009, all deposits into the account, with the exception of three totaling $10,212, were Dr. Hoover's payroll checks from the clinic;

(c) On July 31, 2009, the balance of the WesBanco checking account no. XXXXXX7905 was $11,231.66.

Also attached to Agent Lafferty's Affidavit is a schedule prepared by him, using the Lowest Intermediate Balance Rule, analyzing deposits to and disbursements from the account.  The schedule establishes that between July 31, 2008 and July 31, 2009, the disbursements from the account exceeded the legitimate monies deposited into the account, thereby resulting in the balance of $11,231.66 in the account on July 31, 2009, being traceable to Dr. Hoover's payroll deposits from the clinic.

Mr. Tomasic's "lawsuit settlement" of $191,775.75 was deposited into the WesBanco checking account on August 14, 2009. Between August 1, 2009 and February 28, 2010, only two other

17

deposits of alleged legitimate proceeds were deposited into the WesBanco account: $700.00 from Allegheny Welding on August 10, 2009, and $20,902.83 from Riversource Life Insurance on October 2, 2009. All other deposits during that same time period were Dr. Hoover's payroll checks from the clinic. Agent Lafferty's schedule analyzes these records and establishes that between August 1, 2009 and February 28, 2010, disbursements from the account continued to exceed the legitimate monies that were deposited into the account. As can be seen from reviewing the entries under the sixth column of the schedule accompanying Agent Lafferty's affidavit, the balance of the payroll deposits continued to increase for nine (9) months. Accordingly, Agent Lafferty determined, based on the Lowest Intermediate Balance Rule, that the balance of the account seized on March 2, 2010, that is, the sum of $85,127.08, consisted wholly of proceeds traceable to monies derived by Dr. Hoover through her paychecks from the clinic.

Based on the analysis by Agent Lafferty utilizing the lowest intermediate balance rule approved by <u>Banco Cafetero</u> in tracing drug proceeds commingled with other assets into a bank account, none of the alleged legitimate proceeds of John F. Tomasic remain in the WesBanco Checking Account No. XXXXXX7905. The account balance seized on March 2, 2010, wholly consists of alleged tainted proceeds traceable to paychecks Dr. Hoover received from the medical clinic. Pursuant to 21 U.S.C. § 881(h), the relation-back

doctrine vests title to tainted proceeds in the United States upon commission of the act giving rise to forfeiture.   The acts giving rise to forfeiture in this case consist of the controlled substance violations alleged to have been committed at the clinic prior to the seizure of the funds on March 2, 2010.   As such, Mr. Tomasic has no ownership or possessory rights to the funds seized from the account and therefore lacks Article III standing to defend this forfeiture action.   His responsive pleadings asserting a claim and answer should be dismissed.

2.   **Claimant Tomasic Lacked Dominion and Control over the WesBanco Checking Account**

A review of the numerous deposits into the WesBanco checking account between July 31, 2008 and February 28, 2010, reveals that only six of those deposits were of checks from apparent legitimate sources and were not from Dr. Hoover's paychecks from the medical clinic.   <u>See</u>, Affidavit of Special Agent James F. Lafferty II, pp. 7-9 ("Govt's Exhibit A" to United States Motion for Summary Judgment).   Although the LIBR analysis of the WesBanco checking account clearly establishes that these potential legitimate funds are no longer in the account, the bank records further establish that John Tomasic had no dominion and control over the funds in the account anyway.   This is clearly evident by reviewing all the deposit slips and records of checks or wire transfers drawn on the account during that same period.   These records are included as "Affidavit Exhibit A" to Agent Lafferty's Affidavit.

Of the six checks of alleged legitimate proceeds that were deposited into the account, three of those were payable solely to John F. Tomasic: the $700 check from Allegheny Welding that was deposited on August 10, 2009; the $191,775.75 settlement check from The Masters Law Firm that was deposited on August 14, 2009; and the $21,902.83 check from Riversource Life Insurance Company that was deposited on October 2, 2009. Yet, bank records show that Mr. Tomasic endorsed only one of those checks, that is, the $21,902.83 check from Riversource Life Insurance Company. The other two checks were endorsed with a stamp "Credit to the Account of the Within Named Payee." Two of the remaining three checks which appear to be income tax refunds from the State of West Virginia and the United States Treasury, in the amounts of $6,836 and $2,876 respectively, and which were deposited on November 14, 2008 and December 1, 2008, respectively, were jointly payable to Tomasic and Dr. Hoover, however, copies of the reverse sides of those checks reveal that Dr. Hoover's signature was the sole endorsement on the state refund check and both Hoover and Tomasic endorsed the federal refund check.

Further review of the disbursements from the checking account during that same time period reveal that all disbursements in the form of checks drawn on the account were signed by Katherine Hoover including a $20,000 downpayment on a 2010 Mercedes Benz E350, by check dated August 29, 2009. Dr. Hoover's name is also on the bank

20

record showing the substantial wire transfer of $150,020 on November 6, 2009, to the Estate of William B. Hoover. John F. Tomasic did not utilize this checking account which the parties have acknowledged:

> "Mr. Tomasic never withdrew any money from this account, essentially lending money to his wife to help her settle her uncle's estate and other expenses. ..." (Doc. 87, p. 2)

> "Tomasic had deposits in WesBanco of $191,000 (lawsuit settlement) and $22,000 ... At no time did Tomasic write checks on the above account from the time of the above deposit in October 2009 until ordered withdrawal on March 2, 2010." (Doc. 94)

It is evident from the bank records incorporated into Agent Lafferty's affidavit that Mr. Tomasic never used the account during the entire period between July 31, 2008 through February 28, 2010.

Interestingly, the lawsuit settlement for their son's death resulted in checks being issued to both Dr. Hoover and John Tomasic in the amount of $191,775.75 (see, "Govt's SJ Exhibit B," at page 6), yet only Mr. Tomasic's $191,775.75 check was deposited into the WesBanco account. Dr. Hoover wrote checks and conducted a wire transfer of funds from the account, resulting in none of those funds being left in the account. Dr. Hoover's lawsuit settlement check of $191,775.75 was not deposited into the account, and its whereabouts are unknown.

Based on the foregoing and on the records of the WesBanco checking account incorporated into Agent Lafferty's affidavit, it is clear that John Tomasic lacked dominion and control over the

checking account and had no possessory interest in it, was merely on the account in name only, and accordingly lacks standing to defend this forfeiture action.  See, 18 U.S.C. § 983(d)(6)(B)(iii) (excluding from definition of "owner" a nominee who exercises no dominion or control over the property); United States v. U.S. Currency, $81,000, 189 F.3d 28, 35 (1st Cir. 1999); and United States v. $447,815.00 in U.S. Currency, 2011 WL 4083640 (M.D. N.C. 2011).  See also, United States v. Morgan, 224 F.3d 339, 343-44 (4th Cir. 2000) (applying dominion and control test in criminal forfeiture ancillary proceeding to wife's interest in joint bank account held with defendant).

3.      **John Tomasic, Having Allegedly "Loaned" Dr. Hoover His Lawsuit Settlement Money to Settle Her Uncle's Estate, is a General, Unsecured Creditor and, as such, <u>Lacks Standing to Defend this Forfeiture Action</u>**

For purposes of the innocent owner defense to civil forfeitures under 18 U.S.C. § 983(d)(6), "owner" has been statutorily defined to not include "a person with only a general unsecured interest in, or claim against, the property or estate of another." 18 U.S.C. § 983(d)(6)(B)(i). United States v. $20,193.39 in U.S. Currency, 16 F.3d 344, 346 (9th Cir. 1994) ("Unlike secured creditors, general creditors cannot claim an interest in any particular asset that makes up the debtor's estate.  For this reason, federal courts have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property); United States v. $38,852.00 in U.S.

22

Currency, 328 F. Supp. 2d 768, 769 (N.D. Ohio 2004) (claimant who is owed child support by owner of property being forfeited is unsecured creditor who is barred by § 983(d)(6)(B)(i) from asserting an ownership interest).

In earlier filings in this case, John Tomasic claimed that the money seized from the WesBanco account was the balance of his lawsuit settlement from his son's death. (Doc. 29 & 32, ¶ 1, 2); Doc. 46, p. 4). In more recent filings, however, Tomasic is now alleging that he loaned his settlement money to his wife to help her settle her uncle's estate and other expenses, and that the money deposited into the WesBanco account by Dr. Hoover in the form of her paychecks from the clinic, and the money seized from her room at Dr. Shafer's residence, were repayment of that debt. (Doc. 87, p. 2; Doc. 94).

Since there was no lien or perfected interest securing Mr. Tomasic for this alleged loan to his wife, Mr. Tomasic is an unsecured creditor as to any money belonging to her, and to which he is asserting an interest, based on this loan. Accordingly, based on the foregoing, Mr. Tomasic lacks standing to defend this forfeiture based on his claim that the seized money was intended as repayment for any debt owed to him by his wife, Dr. Hoover.

23

### D.   Conclusion

WHEREFORE, for the foregoing reasons, the court should enter judgment in favor of the United States and against the interest of the Claimant John F. Tomasic for lack of standing.

Respectfully submitted,

UNITED STATES OF AMERICA
By Counsel

R. BOOTH GOODWIN II
United States Attorney

By:   s/Betty A. Pullin
Betty A. Pullin, WV Bar Number: 5590
Attorney for the United States
United States Attorney's Office
300 Virginia Street, East, Room 4000
Charleston, West Virginia 25301
Telephone: (304) 345-2200
Fax: (304) 347-5440
Email: betty.pullin@usdoj.gov