```
         UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF WEST VIRGINIA
                 AT CHARLESTON
```

**UNITED STATES OF AMERICA,**

       Plaintiff

v.                                        Civil Action No. 2:10-1087
                                           (Lead action)

$88,029.08, More or Less,
in United States Currency,

       Defendant

**UNITED STATES OF AMERICA,**

       Plaintiff

v.                                        Civil Action No. 2:11-0101
                                           (Consolidated action)

$27,671.50, MORE OR LESS,
IN UNITED STATES CURRENCY

       Defendant

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are the interested parties', Dr. Katherine Anne Hoover's and John F. Tomasic's, motions (1) to compel an Assistant United States Attorney to submit Form SF 3881 to the United States Marshal to return to them $27,671.50 ("motion to compel"), filed September 22, 2011, (2) for sanctions ("first motion for sanctions") against an Assistant United States Attorney assigned to this action, filed September 22, 2011, (3)

to charge the United States Attorney's Office and the United States Magistrate Judge with patient abandonment ("first patient abandonment motion"), filed December 14, 2011, (4) to strike the United States' reply to an order entered by the magistrate judge on October 20, 2011 ("motion to strike"), filed December 14, 2011, (5) to accept the interested parties' motion to charge the United States Attorney's Office and the magistrate judge with patient abandonment ("second patient abandonment motion"), filed February 6, 2012, (6) to reconsider the court's order refusing a mental competency evaluation ("motion to reconsider evaluation"), filed February 6, 2012, (7) for sanctions against the magistrate judge ("second motion for sanctions") filed February 6, 2012; (8) for summary judgment, filed February 27, 2012, and (9) to compel the United States Marshal to follow an August 2011 order ("second motion to compel").

Also pending are the United States' motions (1) for sanctions against Dr. Hoover arising out of her failure to appear for her court-ordered deposition ("United States' motion for sanctions"), filed September 1, 2011, (2) for an order authorizing a brief delay in releasing funds, filed September 9, 2011, and (3) for summary judgment as to the interest of Mr. Tomasic in the defendant currency, filed October 7, 2011.

I.

A.  The October 20, 2011, Proposed Findings and Recommendation

On October 20, 2011, the magistrate judge filed a set of proposed findings and recommendations ("first PF&R").  First, the magistrate judge recommends that the United States' motion for sanctions be granted to the extent that (1) default judgment be entered against Dr. Hoover respecting her claims for, as more fully discussed below, (a) the $2,902.00 in currency seized from a bedroom dresser during the course of a search of premises occupied by her, and (b) the sum of $85,127.08 seized from a WesBanco account ending in number 7905 in which she maintained an interest, and (2) the United States be awarded its costs in the amount of $217.70 resulting from Dr. Hoover's failure to appear for her July 12 and August 30, 2011, depositions.  Second, the magistrate judge recommends as follows:

1.  That the United States' motion for a brief delay in releasing funds be granted;

2.  That the aforementioned monetary sanction of $217.70 against Dr. Hoover be deducted from the $27,671.50

>    currently awaiting return by the United States to the interested parties;
>
> 3. That the United States be directed to promptly process payment to the interested parties of the net sum of $27,453.80; and
>
> 4. That the interested parties' first motion for sanctions be denied.

On November 22, 2011, the interested parties filed untimely objections to the first PF&R.  The filing appears to unapologetically confirm Dr. Hoover's willful failure to appear for her depositions.  (See, e.g., Objecs. at 1 ("Hoover never intended to defend herself because she has never done anything wrong.")).  The balance of the objections essentially consist of imprecise hyperbole that is unresponsive to the recommendations offered by the magistrate judge.  (See, e.g., Objecs. at 3 ("The interested parties are sending the evidence supporting impeachment proceedings against Magistrate Judge Mary Stanley to the House Judiciary committee [sic] for evaluation and to consider removing her from office.  The murder of innocent patients by the federal government that you, Magistrate Stanley, have sanctioned is a crime against humanity.").

Having considered the matter <u>de novo</u>, and inasmuch as the untimely objections are meritless, the court adopts and incorporates herein the recommendations found in the first PF&R. It is, accordingly, ORDERED as follows:

1. That the United States' motion for sanctions be, and it hereby is, granted to the extent that (a) default judgment be entered against Dr. Hoover respecting her claims for, as more fully discussed below, (i) the $2,902.00 in currency seized from a bedroom dresser during the course of a search of premises occupied by her, and (ii) the sum of $85,127.08 seized from a WesBanco account ending in number 7905 in which she maintained an interest, and (b) the United States be awarded its costs in the amount of $217.70 resulting from her failure to appear for her July 12 and August 30, 2011, depositions, and denied in all other respects;

2. That the United States' motion for a brief delay in releasing funds be, and it hereby is, granted;

3. That the aforementioned monetary sanction of $217.70 against Dr. Hoover be, and it hereby is, deducted from the $27,671.50 currently awaiting return by the United States to the interested parties;

    4.    That the United States be, and it hereby is, directed to, no later than October 31, 2012, process payment to the interested parties jointly of the net sum of $27,453.80; and

    5.    That the first motion for sanctions be, and it hereby is, denied.

B.  The December 30, 2011, Proposed Findings and Recommendation

On December 30, 2011, the magistrate judge filed a second set of proposed findings and recommendations ("second PF&R").  The magistrate judge recommends that the United States' motion for summary judgment be granted.  Dr. Hoover and Mr. Tomasic were granted an extension to file their objections, which were received February 6, 2012.  The court has considered as well the other materials filed by the interested parties following entry of the second PF&R.

The factual circumstances are thoroughly set forth in the second PF&R.  The court briefly summarizes them, and other matters, for contextual purposes.  From August 2008 through February 2010, Dr. Hoover was compensated for her work at Mountain Medical Care Center, LLC, ("the clinic") and related

entities ("clinic payments").  The verified complaint in this action alleges, <u>inter alia</u>, as follows:

> Prescription records of the West Virginia Board of Pharmacy, for the period December 2002 through January 25, 2010, reveal that Dr. Katherine Hoover was the number one prescriber of controlled substances in West Virginia, based upon the number of prescriptions filled under her DEA registration number as reported by pharmacies in West Virginia. Since December 2002, there have been 355,132 prescriptions for controlled substances issued under her DEA number. This figure does not include Dr. Hoover's controlled substance prescriptions filled in Kentucky, which is very close to her Williamson, West Virginia office.

(Verif. Compl. ¶ 11).  This substantial number of prescriptions is explained, in part, by further allegations found in the verified complaint:

> (A) In 2004, Dr. Hoover was one of four physicians working at the clinic at that time. The clinic averaged 150 patients per day but on busy days that number could easily increase to 300 to 400 patients per day. Typically the money generated from the first week of the month paid all salaries and overhead expenses and the remaining three weeks income was pure profit for the business.
>
> (B) Approximately 70% of patients seen at the clinic paid in cash, paying $450 for a first time patient and $150 for established patients. The clinic generally only accepted insurance from individuals involved in Kentucky due to "P.I.P.", a Kentucky based private insurance program which guaranteed the clinic the sum of $10,000 per patient. Patients were then transferred to the Aquatic Rehab Center until the $10,000 was exhausted. The patient then became a cash patient, returning to the clinic on a monthly basis.
>
> (C) Dr. Hoover was known by clinic staff and patients to prescribe pain medication "to anyone." As a result, her prescribing practices generated the largest income for the clinic. According to clinic staff, Dr. Hoover

>       used poor documentation when prescribing medications,
>       and nurses and clinic staff had to document charts to
>       make them appear in proper form in the event they were
>       searched by law enforcement.

(Id. ¶¶ 10(A)-(C)).

The clinic was apparently in operation through at least March 2010.  On March 2, 2010, a search warrant was executed on the WesBanco account ending in 7905.  Account 7905 was held jointly by Dr. Hoover and Mr. Tomasic.  An investigating special agent with the Federal Bureau of Investigation, James F. Lafferty II, who is described as a Certified Public Accountant, analyzed the WesBanco account for forfeiture purposes.  In his affidavit filed in the lead action, he notes that $124,900.00 in clinic-related funds were deposited into the account from August 6, 2008, through January 27, 2010.  The balance in the account at the time of the March 2, 2010, seizure was $85,127.08.  That same day, a separate warrant was executed at a bedroom used by Dr. Hoover while she was in Williamson working at the clinic.  The sum of $2,902.00 was seized which, summed with the aforementioned $85,127.08, totals $88,029.08, namely, the defendant currency.

The magistrate judge has aptly demonstrated why Mr. Tomasic has no ownership interest in the $2,902.00.  Inasmuch as Dr. Hoover may not lay claim to that sum based upon the default

judgment sanction earlier imposed, the magistrate judge's analysis is unassailable. The objections thereto are hence not meritorious.

The $85,127.08 requires a more extended analysis, at least as to the claim of Mr. Tomasic. The clinic payments, along with other monies from unrelated sources ("nonclinic payments"), were commingled within the WesBanco account. From July 31, 2008, through February 28, 2010, all deposits into the account, except for interest payments and six checks totaling $224,590.58, were clinic payments to Dr. Hoover, aggregating $124,900.00.[1]

---

[1] In point of equity, the court notes as to account 7905 that withdrawals equivalent to the bulk of the non-clinic funds were made during November, 2009. First, the joint bank account of Dr. Hoover and Mr. Tomasic received clinic monies paid to Dr. Hoover aggregating $124,900.00. Second, the non-clinic funds deposited in that account in the amount of some $238,106.90 consisted almost entirely of four checks: (1) settlement funds for the death of their son for which Mr. Tomasic's share was $191,775.75; (2) insurance proceeds received by Mr. Tomasic upon the death of his mother in the amount of $21,902.83; (3) a check from the State of West Virginia payable to them jointly in the amount of $6,836.00; and (4) a check from the United States Treasury payable to them jointly in the amount of $2,876.00.

In their response filed November 8, 2011, to the motion of the United States for summary judgment, which response was signed by both Dr. Hoover and Mr. Tomasic, the following statement appears:

> Dr. Hoover asked to borrow the money from her husband that he received from the law suit and his mother. He agreed to loan it to her . . .

As noted by the magistrate judge, an investigating special agent with the Federal Bureau of Investigation, James F. Lafferty II, analyzed the WesBanco account for forfeiture purposes. As more fully described in the second PF&R, he utilized the Lowest Intermediate Balance Rule ("LIBR") to ascertain the sum left in the account that was traceable to clinic payments. The leading case on the LIBR approach is <u>United States v. Banco Cafetero Panama</u>, 797 F.2d 1154 (2nd Cir. 1986).[2]

---

> The loan agreement between the interested parties was a verbal agreement . . .
>
> The loan to Dr. Hoover was made with the express intent of repayment by Dr. Hoover.

Following the receipt and deposit by Mr. Tomasic of the settlement monies on August 14, 2009, and the insurance money on October 2, 2009, the disbursements from the bank account in November, 2009, alone aggregated $155,102.55, equal to 72.5% of the settlement and insurance money received by Mr. Tomasic.

[2] The Second Circuit in <u>Banco Cafetero</u> found support for the LIBR approach in the principle "used to determine the rights of a trust beneficiary to a trustee's bank account in which trust funds and the trustee's personal funds have been commingled." <u>Banco Cafetero</u>, 797 F.2d at 1159. It cited <u>Restatement (Second) of Trusts</u> § 202(1) comment j (1959), which provides as follows:

> <u>j. Effect of withdrawals and subsequent additions</u>. Where the trustee deposits in a single account in a bank trust funds and his individual funds, and makes withdrawals from the deposit and dissipates the money so withdrawn, and subsequently makes additional deposits of his individual funds in the account, the beneficiary cannot ordinarily enforce an equitable lien upon the deposit for a sum greater than the <u>lowest intermediate balance</u> of the deposit. If the

In <u>Banco Cafetero</u>, the United States attempted to forfeit approximately $3 million in five bank accounts as "proceeds traceable" to narcotics transactions pursuant to 21 U.S.C. § 881(a)(6)[3]. That is the same statute pursuant to which the United States proceeds here, along with 18 U.S.C. § 983(a), which provides the general rules for civil forfeiture proceedings. The Second Circuit confronted the question concerning the circumstances that would constitute "a 'traceable connection' . . . between a drug sale and a credit balance of an active account into which some drug sale proceeds were

---

> amount on deposit at all times after the deposit of
> the trust funds equalled or exceeded the amount of
> trust funds deposited, the beneficiary is entitled to
> a lien upon the deposit for the full amount of the
> trust funds deposited in the account. If after the
> deposit of trust funds in the account the deposit was
> wholly exhausted by withdrawals before subsequent
> deposits of the trustee's individual funds were made,
> the beneficiary's lien upon the deposit is
> extinguished, and if he is unable to trace the money
> withdrawn, he is relegated to a mere personal claim
> against the trustee, and is entitled to no priority
> over other creditors of the trustee.

<u>Id.</u> (emphasis added).

[3] Section 881(a)(6) provides in pertinent part that the following property is forfeitable to the United States:

> All moneys . . . furnished or intended to be furnished
> by any person in exchange for a controlled substance .
> . . in violation of this subchapter, all <u>proceeds
> traceable</u> to such an exchange, and all moneys . . .
> used or intended to be used to facilitate any
> violation of this subchapter.

<u>Id.</u> (emphasis added).

deposited." <u>Id.</u> at 1159. The panel noted three possible accounting methods to resolve the issue, settling on the LIBR method described below:

> If $100 from a drug sale is deposited into an active account, one approach is to consider the account to be "traceable proceeds" to the extent of $100 as long as the account balance never falls below that sum. [Under this approach, untainted money added to the account after the balance has fallen below the amount of the tainted proceeds is immune from seizure.] This might be called a "drugs-in, last-out" rule. This approach, more properly called the "lowest intermediate balance" rule, is used to determine the rights of a trust beneficiary to a trustee's bank account in which trust funds and the trustee's personal funds have been commingled. <u>See</u> Restatement (Second) of Trusts § 202(1) comment j (1959). This method is also used in the area of secured transactions to trace proceeds of the sale of collateral in commingled funds in the hands of a debtor or to a debtor's transferee not in the ordinary course of business.

<u>Id.</u> at 1159 (footnote 5 of opinion reflected in brackets at the location where it appears in the discussion); <u>See</u> <u>United States v. Moore</u>, 27 F.3d 969, 976-77 (4th Cir. 1994) ("Money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly-acquired funds and the legitimately-acquired funds . . . cannot be distinguished from each other; that is, they cannot be traced to any particular source, absent resort to accepted, but arbitrary, accounting techniques, <u>see</u> <u>United States v. Banco Cafetero Panama</u>, 797 F.2d 1154, 1159–60 (2d Cir. 1986) (drug proceeds commingled with legitimate funds

are potentially traceable through the "first-in, first-out," pro rata "averaging," and "first-in, last-out" methods)."); Mark Levy, Federal Money Laundering § 24.06 (Elec. ed. 2011) (noting that under the Banco Cafetero rule, "forfeiture is permitted so long as the total balance in the account never falls below the amount of the sum of the illicit proceeds deposited in the account.").

Special Agent Lafferty's affidavit and supporting materials reflect that from August 1, 2008, through the time of the seizure on March 2, 2010, disbursements from the WesBanco account never exceeded the clinic funds deposited therein over time. Neither did the WesBanco account ever zero out. As stated in the affidavit, at the time the defendant currency was seized, non-clinic funds had been exhausted, leaving only clinic funds in the WesBanco account. Thus the entire sum remaining in the WesBanco account at the time of the seizure, $85,127.08, out of a total of $124,900.00 in clinic funds deposited, was forfeitable pursuant to Banco Cafetero.[4]

The magistrate judge declined to consider the unsworn, and hence infirm, source-of-funds allegations made by Dr. Hoover

---

[4] The United States has not asserted that fungible property statute found at 18 U.S.C. § 984 bears on the matter. The court thus does not address its applicability.

13

and Mr. Tomasic.  Following entry of the PF&R, however, Dr. Hoover and Mr. Tomasic have attempted to "verify all of the pleadings that have been filed, the current pleading and all future pleadings."  (Mot. at 1).  To the extent that attempt to swear-by-reference is authorized by law, it matters not for two reasons.

First, Dr. Hoover and Mr. Tomasic have failed to raise a genuine issue of material fact respecting the illegal nature of the clinic proceeds deposited into the WesBanco account, as more fully set forth in the "CONCLUSION" section of the verified complaint in the lead action, along with Special Agent Lafferty's affidavit.  Second, under the LIBR method, the nature of the disbursements, and indeed the deposits from lawful sources, are not the primary foci.  As long as the total balance in the account never falls below the amount of the sum of the illicit proceeds deposited into it, forfeiture is appropriate.  That is the precise conclusion reached by Special Agent Lafferty, as reflected in Exhibit B to his affidavit.

Having considered the matter de novo, and inasmuch as the objections and other materials filed by the interested parties are meritless, the court adopts and incorporates herein

the recommendations found in the second PF&R.  It is ORDERED as follows:

1. That the interested parties' motion to compel and second motion to compel be, and they hereby are, denied as moot;

2. That the United States' motion for summary judgment be, and it hereby is, granted, inasmuch as there is no genuine issue of material fact respecting the forfeitable nature of the defendant currency;

3. That the interested parties' first and second patient abandonment motions, motion to strike, motion to reconsider evaluation, second motion for sanctions, and motion for summary judgment be, and they hereby are, denied as patently frivolous, or as fully analyzed by earlier orders, and without the need for further discussion; and

4. That this action be, and it hereby is, dismissed and stricken from the docket.

The Clerk is directed to transmit a copy of this written opinion and order to counsel of record and the interested parties.

>	DATED: September 28, 2012
>
>	_____
>	John T. Copenhaver, Jr.
>	United States District Judge